EDWARD M. KNOX, Respondent, *v.* EDEN MUSEE AMERICAIN COMPANY (Limited), Appellant.

1. STOCK CERTIFICATES — LIMITED NEGOTIABILITY. Certificates of stock in a business corporation, indorsed in blank, do not possess the quality of complete negotiability accorded to commercial paper, to the extent of making a transfer to a purchaser in good faith, for value, equivalent to actual title, although there was no agency in the transferrer, and the certificate had been lost without the fault of the true owner, or had been obtained by theft or robbery.

2. LOST OR STOLEN STOCK CERTIFICATES — RIGHTS OF TRUE OWNER. The title of the true owner of a lost or stolen certificate of stock may be asserted against any one subsequently obtaining its possession, although the holder may be a *bona fide* purchaser.

3. CORPORATION STOCK CERTIFICATES — AGENCY. The act of the manager of a business corporation, without any authority, apparent or real, to issue certificates for any purpose, in issuing as valid as security for a personal debt, surrendered certificates of stock directed by its president to be canceled, and of which the company had never invested the manager with indicia of ownership, is a willful and criminal act, and upon no principle of agency, either express or implied, can the corporation be made liable therefor.

4. MASTER AND SERVANT — RECLAMATION OF CHATTEL. A master is not bound to anticipate or provide against the possibility of criminal acts on the part of a servant who has hitherto been faithful in the performance of his duties, and there must be something more than the mere intrusting to a servant of the custody of a chattel and the consequent opportunity for theft in order to preclude the master from reclaiming it, if stolen by the servant and sold to another.

56

5. MASTER AND SERVANT — BREACH OF TRUST AND CONFIDENCE — LIABILITY TO THIRD PARTY.  The rule, that where one of two innocent persons must suffer for the act of a third, he that employs and puts trust and confidence in the wrongdoer should be the loser rather than a stranger, is not applicable to a case where the only trust and confidence is that reposed by a master in a servant in respect to the care and custody of his property, but having no other power of disposition or control over it.

6. CORPORATION — NEGLIGENCE — NON-LIABILITY FOR WRONGFUL USE OF STOCK CERTIFICATES BY EMPLOYEE.  The facts that the president of a business corporation in a single instance relied upon its manager, an employee who had theretofore proved trustworthy, to cancel, in pursuance of his directions, certain certificates of stock indorsed in blank and surrendered for transfer, and that for that purpose the uncanceled certificates were left in a safe to which the manager had access, do not constitute such actionable negligence as will estop the company from claiming such certificates as against a *bona fide* holder to whom the manager thereafter wrongfully and fraudulently delivered them, as security for a loan to himself, or render the corporation liable to such holder for the value of the certificates.

7. CORPORATION — BY-LAWS — NEGLIGENCE.  The by-laws of a corporation are primarily for its own and stockholders' protection; the neglect by its officers, therefore, in a single instance to obey a by-law which directs the cancellation of all certificates of stock surrendered for transfer, before the issuing of new certificates, is not such negligence as will render the corporation liable, at the suit of an innocent third party, for the value of certificates which should have been canceled but which were fraudulently pledged to such party, by the manager employed by the corporation, as security for a loan made to him personally.

*McNeil* v. *Tenth Nat. Bank* (46 N. Y. 325); *N. Y. & N. H. R. R. Co.* v. *Schuyler* (34 N. Y. 30); *Lickbarrow* v. *Mason* (2 D. & E. 70); *Hern* v. *Nichols* (1 Salk. 289), distinguished.

*Knox* v. *Eden Musee Americain Co.* (74 Hun, 483), reversed.

(Argued January 9, 1896; decided February 18, 1896.)

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order made December 15, 1893, which affirmed a judgment in favor of the plaintiff entered upon the report of a referee.

This action was brought to recover damages alleged to have been sustained through the defendant's alleged negligence in failing to cancel three certificates of its capital stock, surrendered to it for transfer, which the plaintiff claimed he was

induced to receive as valid, although other certificates had been issued in their stead.

The report of the referee was as follows :

### FINDINGS OF FACT.

*First.* The defendant, The Eden Musee Americain Company, Limited, is, and at all the times hereinafter mentioned was, a business corporation organized and existing under and by virtue of the laws of this state, to wit: Chapter 611 of the Laws of 1875. The capital stock of the company was at first the sum of four hundred thousand dollars, divided into four thousand shares of the par value of one hundred dollars each, but after the incorporation and prior to the times hereinafter mentioned, the capital was reduced to the sum of three hundred and thirty thousand dollars, divided into three thousand three hundred shares, of the par value of one hundred dollars each, all of which had been fully issued and were outstanding prior to April 1st, 1891. *Second.* Under the powers conferred upon it by statute, the defendant had adopted by-laws, regulating, amongst other things, the issue and transfer of certificates of its stock and imposing upon certain of its officers various duties with respect to such issue and transfer. The method of issue and transfer of certificates was prescribed by sections 2 and 3 of article 3 of the by-laws, which were as follows, viz.: " SECTION 2. Certificates of stock shall be numbered and registered in the order in which they are issued, and shall be signed by the president or vice-president, and countersigned by the treasurer, and the seal of the company shall be affixed thereto. All certificates shall be bound in a book and shall be issued in consecutive order therefrom ; and in the margin thereof shall be entered the name of the person owning the shares therein, represented with the number of shares and the date thereof. Each certificate shall be receipted for in the certificate book. All certificates exchanged or returned to the company shall be canceled by the secretary, and such canceled certificates pasted in their original place in the certificate book, and no new certificate shall be issued until the

old certificate has been thus canceled and returned to its original place in said book. Section 3. Transfers of shares shall only be made upon the books of the company by the holder in person or by power of attorney, duly executed and acknowledged, and filed with the secretary of the company, and on the surrender of the certificate or certificates of such shares." By other by-laws it was further provided that it should be the duty of the president " to sign all certificates of stock of the company; " of the treasurer " to countersign all certificates of stock signed by the president," and of the secretary to " affix the seal of the company to all certificates of stock when signed by the president and countersigned by the treasurer," and that the secretary should " have charge of the certificate book, transfer books and stock ledger." The plaintiff had no knowledge of the by-laws. *Third.* For a number of years prior to May 8, 1891, and down to October or November in the year 1891, Ernest Andre Jurgens was in the employ of the defendant as general manager of its business, which was the carrying on of a museum or place of show and entertainment in Twenty-third street in the city of New York. The office of the company was in the same building with its museum, and Jurgens, subject to the oversight of the president, was in charge of both the office and the museum. The stock certificate book was kept in a safe in the office. In April and May, 1891, and for some time prior thereto, one Frank M. Reynolds was in the employ of the defendant as a clerk. During the years he had been employed by the company Jurgens had been, so far as they were aware, perfectly honest, and nothing had come to the knowledge of the company prior to October, 1891, which would lead them to suppose that Jurgens was not honest and trustworthy. During the time of his employment by the company he had been intrusted with money and jewels to the value of more than $50,000, and he had faithfully fulfilled his trust with reference to the same. *Fourth.* About May 8, 1891, Reynolds applied to the plaintiff for a loan of $2,500 to himself and Jurgens, by the discount of his (Reynolds') note,

indorsed by Jurgens.    Plaintiff declined to make such loan or discount unless security was furnished, whereupon Reynolds offered to give as security twenty shares of the capital stock of the defendant, which he stated to plaintiff belonged to him or Jurgens.    The plaintiff thereupon consented to discount Reynolds' note, indorsed by Jurgens, on the pledge of twenty shares of the capital stock of the defendant, as collateral. Plaintiff knew that Reynolds and Jurgens were in the employ of the defendant, and believed that Jurgens was its managing director.    *Fifth.* Thereafter, and on or about the day last aforesaid, Reynolds presented to the plaintiff four certificates of stock of the defendant, numbered, dated and in the names of stockholders, as follows : Certificate No. 221, dated April 29, 1886, in the name of Mrs. Eva M. Chase.    Certificate No. 497, dated October 7, 1889, in the name of Mrs. Hattie L. Blish.    Certificate No. 498, dated October 7, 1889, in the name of Mrs. Hattie L. Blish.    Certificate No. 517, dated December, 1890, in the name of Seligsberg & Co.    Each of the certificates was in the regular and proper form of stock certificate issued by the defendant ; was duly and regularly signed by its president, and countersigned by its treasurer, and bore the impress of its corporate seal, and each certificate set forth that the person named therein was the owner and entitled to five shares of the capital stock of the defendant, which were transferable only on the books of the defendant in person or by attorney on surrender of the certificate.    Each of the certificates had printed upon it as an indorsement the usual blank form of power of attorney to transfer, and the powers of attorney on certificates numbers 497, 498 and 517 were duly signed in blank by the respective persons named in the certificates as the owners thereof.    The power of attorney indorsed on certificate No. 221 was signed by Eva M. Chase, the person named in the certificate as the owner thereof, but the name of Seligsberg and Company was written in the power of attorney as the persons to make transfer of the certificate. *Sixth.*    On the receipt of the certificates of stock and the note of Reynolds for $2,500, indorsed by Jurgens, the plaintiff exam-

ined the certificates and on them as security discounted the
note, paying the proceeds thereof to Reynolds. When
the note became due it was renewed and a new note for
$2,500, made by Reynolds and indorsed by Jurgens, was
given in its stead. On the maturity of this second note the
sum of $500 was paid on account of it, and two notes of
$1,000 each, made and indorsed in like manner as the former,
one payable in two months and the other in three months,
were given to plaintiff. When the first of these notes came
due, $200 was paid on account of it and a renewal note for
$800 was given. The second note of $1,000 became due
January 18, 1892, but was not paid at maturity, nor was the
renewal note of $800, which became due March 2, 1892, paid;
though both were duly presented for payment, and demand
of payment made. Both have remained wholly unpaid, and
are now in the possession of the plaintiff as holder and owner.
On or about February 9, 1892, after the said renewal note of
$1,000 had gone to protest and before the said note of $800
matured, Reynolds notified plaintiff that he was unable to pay
any part of the indebtedness aforesaid. At the time of the
discount and receipt of the certificates, the plaintiff did not
observe that in the indorsement of No. 221 the name of Sel-
igsberg & Co. was inserted. No claim is made by the plain-
tiff on this certificate. The statement of Reynolds that said
certificates and stock belonged to him or Jurgens was false in
fact and fraudulent so far as Jurgens was concerned. The
certificates had ceased to be valid certificates of stock, and had
become mere vouchers belonging to the defendant. In accept-
ing the alleged certificates from Reynolds, the plaintiff made
no inquiry as to their validity or genuineness beyond an
examination of the papers themselves. In making said loan
he relied upon the apparent validity and genuineness of said
certificates, and he believed the same to be valid and genuine.
He believed the statement made by said Reynolds, as afore-
said, to be true. *Seventh.* The four certificates of stock here-
inbefore referred to, and the twenty shares of the defendant's
capital originally represented by them, were in April, 1891,

the property of Seligsberg and Company, a firm of which Theodore Hellman, who was and had been from its organization president of the defendant, was a member. In April, 1891, Hellman accepted an offer for the sale of this stock to one Siebrecht, at $114 a share. This offer was made through Jurgens, the manager of the defendant. Hellman took the certificates, indorsed as described, to the office of the company, but learning that the purchaser was not then ready to pay for the stock, he left the certificates there in the office safe, and under the sole care and control of Jurgens, to be canceled by him when Siebrecht, the purchaser, paid for the shares. On April 27, 1891, which was about three weeks thereafter, Siebrecht's check for the purchase price of the stock was sent to Hellman by Jurgens, with a new certificate for twenty shares, which was completely executed except for the signature of the president, which had not yet been made to it. Hellman accepted the check, signed the new certificate as president, and returned it to Jurgens. *Eighth.* The old certificates (being the four pledged to the plaintiff as aforesaid), which Hellman had left in the safe under the care of Jurgens at the company's office, were never canceled or pasted in the stock certificate book. They were not shown to Hellman, either at the time he signed the new certificate to Siebrecht, or any other time down to the trial of this action, nor did he at the time he signed the new certificate, or at any time until January, 1892, ask for them or inquire as to their whereabouts, or have or seek any knowledge whatever concerning their cancellation or non-cancellation, existence or non-existence. They remained in the safe till after the new certificate for twenty shares was issued and delivered to Siebrecht, and were thereafter fraudulently taken therefrom by Jurgens and used through Reynolds in obtaining said loan from the plaintiff. *Ninth.* The safe in the company's office, in which Hellman had left the old certificates, contained the stock certificate book and the stock transfer book, and all canceled stock certificates. Jurgens was the only person who had the combination to this safe. No officer of the company

examined the books and canceled certificates contained in this
safe from the said 27th day of April, 1891, till the 29th or
30th day of October, 1891. At about the last-mentioned time
Hellman examined the books and papers in the safe, but failed
at that time to discover that the four old certificates aforesaid
were uncanceled and outstanding, and this was not discovered
by any officer of the defendant till January, 1892. *Tenth.*
No other officer of the defendant took any part in the surren-
der of the four old certificates, and none other (except the
treasurer) took any part in the issue of the new certificate, and
he, the treasurer, signed the same before it was signed by the
president. The secretary had never attended to any of the
details of the transfer of stock and the issue of new certifi-
cates. The acts of canceling surrendered certificates and past-
ing them in the certificate book, of making out new ones and
impressing upon them the company's seal, had always been
done, when done at all, by Jurgens, and it was the latter alone
who had and exercised charge over the stock book, transfer
book and canceled certificates. During a period of five or six
years prior to April 27th, 1891, there had taken place only two
hundred and fifty transfers of the defendant's capital stock
upon its books. The actual course of business usually pursued
by the defendant in relation to transfers of stock was as fol-
lows: The certificates which were to be surrendered for trans-
fer were taken to the office of the company in West Twenty-
third street. A new certificate to be issued in place of those
surrendered would be filled out, and this new certificate, after
being signed by the treasurer and having placed upon it the
seal of the company, would be presented to the president of
the company, together with the old certificate in lieu of which it
was issued, canceled, and the president would thereupon sign
the new certificate. *Eleventh.* The action of the president of
the defendant in signing a new certificate of stock in the place
of the four certificates then outstanding, without the produc-
tion of such outstanding certificates, and without ascertaining
that they had been canceled, was a violation of his duty under
the by-laws of the company, and constituted negligence on the

part of the defendant. The failure of the defendant and of its officers and directors to exercise any proper supervision over the transfer of the old certificates and the issue of the new, or over the old certificates after they had been left with Jurgens, or over Jurgens' conduct with reference thereto, and leaving the three certificates Nos. 497, 498 and 517, with Jurgens in such negotiable form as aforesaid, also constituted negligence on the part of the defendant; and the negligence of the defendant as aforesaid was the cause of the loss to the plaintiff of the amount so loaned by him on the security of said three certificates to the extent of what would have been their value if they had been genuine; and in respect to said three certificates the plaintiff was not guilty of any negligence which contributed to the loss. *Twelfth.* On May 10th, 1892, the plaintiff made a demand upon the defendant for the transfer of the three certificates Nos. 497, 498 and 517 as aforesaid, which was refused; and thereupon demanded of the defendant the value of fifteen shares of its stock, which was also refused. Thereafter and on the same day this action was begun. *Thirteenth.* The capital stock of the defendant was worth, at the time of the demand aforesaid, $114 a share, and fifteen shares thereof were worth $1,710.

### CONCLUSIONS OF LAW.

1. The defendant is estopped to deny the validity and genuineness of said three certificates Nos. 497, 498 and 517. 2. The plaintiff is entitled to recover of the defendant the damages sustained by him by reason of his loan of money on the faith of said certificates, not exceeding the value of the shares represented by said three certificates, Nos. 497, 498 and 517, if the same had been valid, to wit: $1,710, with interest from the 10th day of May, 1892, one hundred and nine and $\frac{72}{100}$ dollars, being in all one thousand eight hundred and nineteen dollars and seventy-two cents, with costs of this action.

*Charles Steele* and *William D. Guthrie* for appellant. This controversy should not be controlled by the rule established in

57

the *Schuyler* case and a number of other similar decisions ; they depend upon the doctrine of agency, and where recoveries have been had for stock fraudulently issued, it was put upon the ground that the fraud was committed by the agent of the company, as its official representative, in the course of his employment. (*M. L. Ins. Co.* v. *F. S. S., etc., R. R. Co.,* 139 N. Y. 146 ; *Bank of N. Y. N. B. Assn.* v. *A. D. & T. Co.,* 143 N. Y. 559.) Stock certificates, even when indorsed in blank, as was the case with three of those in question here, are not strictly negotiable instruments. (*M. Bank* v. *N. Y. & N. H. R. R. Co.,* 13 N. Y. 599 ; *Weaver* v. *Barden,* 49 N. Y. 286 ; *Hammond* v. *Hastings,* 134 U. S. 401 ; Cook on Stockholders [2d ed.], § 368 ; *Anderson* v. *Nicholas,* 28 N. Y. 600 ; *Wells* v. *Smith,* 7 Abb. Pr. 261 ; *B. E. L. Co.* v. *Robinson,* 52 Fed. Rep. 523 ; *People* v. *Bank of N. A.,* 75 N. Y. 547 ; *Biddle* v. *Bayard,* 13 Penn. St. 150 ; *Burson* v. *Huntington,* 21 Mich. 415, 486 ; *Coddington* v. *Gilbert,* 17 N. Y. 489 ; *Sickles* v. *Richardson,* 23 Hun, 559 ; *Wilson* v. *M. E. R. Co.,* 120 N. Y. 145, 150 ; *M. L. Ins. Co.* v. *F. S. S., etc., R. R. Co.,* 139 N. Y. 146, 151 ; *Bank of N. Y. N. B. Assn.* v. *A. D. & T. Co.,* 143 N. Y. 559 ; *Simmons* v. *L. J. S. Bank,* L. R. [1 Ch. Div. 1891] 270 ; *Central Bank of B.* v. *Hammett,* 50 N. Y. 158 ; *Moore* v. *Citizens' Bank,* 15 Fed. Rep. 141 ; 111 U. S. 156 ; *Board of Education* v. *Sinton,* 41 Ohio St. 504, 513 ; *Farrington* v. *S. B. R. R. Co.,* 150 Mass. 406 ; *Hill* v. *J. P. Co.,* 154 Mass. 172 ; *Garrard* v. *P. R. R. Co.,* 29 Penn. St. 154.) It is clear that there can be no estoppel as against the defendant, for the defendant did no act which would estop it from asserting its title to these vouchers, which had been stolen from its possession. (*Swan* v. *N. B. A. Co.,* 2 H. & C. 175.) The fact that the company had not complied with the provisions of its by-laws relating to the surrender and cancellation of stock certificates is not evidence of negligence on its part as towards the plaintiff. (*Flint* v. *Pierce,* 99 Mass. 68 ; *Pritchard's Case,* L. R. [8 Ch. App.] 956 ; *Ward* v. *Johnson,* 95 Ill. 215 ; *Bank of N. Y. N. B. Assn.* v. *A. D. & T. Co.,* 143 N. Y. 559 ; *People* v. *Bank of N.*

*A.*, 75 N. Y. 547.) The referee's finding, that the defendant's stock, at the time the plaintiff demanded the transfer of the shares in question, was worth $114 a share, is utterly unsupported by evidence. (*Smith* v. *Griffith*, 3 Hill, 333; *Graham* v. *Maitland*, 1 Sweeny, 149; *Harris* v. *P. R. R. Co.*, 58 N. Y. 660; *Dana* v. *Fiedler*, 1 E. D. Smith, 463, 474, 475; Sedgwick on Dam. [8th ed.] § 244.) There is no evidence of negligence on the part of the defendant. (*People* v. *Bank of N. A.*, 75 N. Y. 547; *Bd. of Education* v. *Sinton*, 41 Ohio St. 504; *M. Nat. Bank* v. *Guilmarten*, 88 Ga. 797; *B. E. L. & P. Co.* v. *Robinson*, 52 Fed. Rep. 520; *Scott* v. *Nat. Bank*, 72 Penn. St. 471; *Hill* v. *J. P. Co.*, 154 Mass. 172; *P. S. G. C. Co.* v. *Wilson*, 49 L. J. [N. S.] C. L. 715; *Goodwin* v. *A. Nat. Bank*, 48 Conn. 550, 568; *Maas* v. *M., K. & T. R. Co.*, 83 N. Y. 223.) The defendant's negligence, if any, was not the proximate cause of the plaintiff's loss. (*Bd. of Education* v. *Sinton*, 41 Ohio St. 504; *Hill* v. *J. P. Co.*, 154 Mass. 172; *Swan* v. *N. B. A. Co.*, 2 H. & C. 175; *Bank of Ireland* v. *Evans' Charities*, 5 H. of L. Cas. 388, 410; *Staple of Eng.* v. *Bank of Eng.*, L. R. [21 Q. B. D.] 160, 176; *Arnold* v. *Cheque Bank*, L. R. [1 C. P. D.] 578, 588; *Ledwich* v. *McKim*, 53 N. Y. 307; *Jackson* v. *V., etc., R. R. Co.*, 13 Alb. L. J. 353; Penal Code, §§ 518, 528; *M. L. Ins. Co.* v. *F. S. S. etc., R. R. Co.*, 139 N. Y. 146; *People* v. *Moore*, 37 Hun, 84; *People* v. *Civille*, 44 Hun, 497.) The plaintiff was guilty of contributory negligence. (*Bd. of Education* v. *Sinton*, 41 Ohio St. 504; *Isham* v. *Post*, 141 N. Y. 100.)

*Henry D. Hotchkiss* for respondent. The three certificates were in effect negotiable securities, and they are good in the hands of a purchaser in good faith and for value. (Beach on Corp. § 678; Daniels on Neg. Inst. § 1708; Cook on Stock [3d ed.], § 415; *Friedlander* v. *T. & P. R. Co.*, 130 U. S. 416; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 195; *Shaw* v. *Bank*, 11 Otto, 557; *Mercer County* v. *Hackett*, 1 Wall. 86; Morawetz on Priv. Corp. [2d

ed.] § 185; *Kortright* v. *B. C. Bank*, 20 Wend. 91; *M. Bank* v. *N. Y. & N. H. R. R. Co.*, 13 N. Y. 599; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30; *McNeil* v. *T. Nat. Bank*, 46 N. Y. 325; *Leitch* v. *Wells*, 48 N. Y. 585; *F. A. Bank* v. *F. S. S., etc., R. R. Co.*, 137 N. Y. 231; *Bank* v. *Lanier*, 11 Wall. 369; *Johnston* v. *Laflin*, 103 U. S. 800; Laws of 1875, chap. 611, § 12; Morawetz on Priv. Corp. [2d ed.] § 190; Cook on Stock [3d ed.], § 416; *S. D. Co.* v. *Elliott*, 10 Cal. 333; *Pratt* v. *Tilt*, 28 N. J. Eq. 483; *Moore* v. *M. N. Bank*, 55 N. Y. 41.) The defendant was guilty of negligence, and is estopped from disputing the validity of these certificates. (*N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30; *Nolton* v. *W. R. R. Corp.*, 15 N. Y. 444; *Coggs* v. *Bernard*, Ld. Raym. 909; *R. R. Co.* v. *Robbins*, 35 Ohio St. 483; *Lowry* v. *C. & F. Bank*, Taney's C. C. Dec. 310; *Roosevelt* v. *L. & R. I. Co.*, 11 Misc. Rep. 595; *Hubbell* v. *City of Yonkers*, 104 N. Y. 439; *Gilson* v. *D. & H. C. Co.*, 36 Am. St. Rep. 802; *Holbrook* v. *N. J. Z. Co.*, 57 N. Y. 616; *N. Y. & N. H. R. R. Co.* v. *Schuyler*, 34 N. Y. 30; *Leitch* v. *Wells*, 48 N. Y. 585; *McNeil* v. *T. Nat. Bank*, 46 N. Y. 325; *Titus* v. *G. W. T. Road*, 61 N. Y. 237; *F. A. Bank* v. *F. S. S., etc., R. R. Co.*, 137 N. Y. 231; *Griswold* v. *Haven*, 25 N. Y. 599; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 199; *People* v. *Bank of N. A.*, 75 N. Y. 547.) The defendant's negligence was the proximate cause of the loss. (*Holbrook* v. *N. J. Z. Co.*, 57 N. Y. 616; *Bank of Batavia* v. *N. Y., L. E. & W. R. R. Co.*, 106 N. Y. 195; *Mayenborg* v. *Haynes*, 50 N. Y. 675; *Maguire* v. *Selden*, 103 N. Y. 642; *Hardy* v. *Bank*, 51 Md. 591; *Hern* v. *Nichols*, 1 Salk. 289; *Ring* v. *City of Cohoes*, 77 N. Y. 83; *Ehrgott* v. *Mayor, etc.*, 96 N. Y. 283; *West* v. *Ward*, 16 Am. St. Rep. 284; *McCahill* v. *Kipp*, 2 E. D. Smith, 413; *Van Houten* v. *Fleischman*, 1 Misc. Rep. 134; 142 N. Y. 624; *Moores* v. *C. N. Bank of P.*, 111 U. S. 156; *Lowery* v. *M. R. Co.*, 99 N. Y. 163; *Swan* v. *N. B. A. Co.*, 2 H. & C. 175.) Irrespective of estoppel, the defendant is liable for its negligence. (*Thomas* v. *Winchester*, 6 N. Y. 397; Smith.

on Neg. 90 ; Whart. on Neg. § 853 ; *Van Winkle* v. *A. S. B. Ins. Co.*, 52 N. J. L. 240 ; Broom's Com. Law [4th ed.], 673.) Jurgens was defendant's agent to cancel, and defendant is liable for his acts. (*McNeil* v. *T. Nat. Bank*, 46 N. Y. 330 ; *People* v. *Bank of N. A.*, 75 N. Y. 547.) No actual notice to plaintiff of any invalidity of the stock is shown. (*Isham* v. *Post*, 141 N. Y. 100.) The doctrine of constructive notice does not apply. (*Seybel* v. *N. C. Bank*, 54 N. Y. 288 ; *Birdsall* v. *Russell*, 29 N. Y. 220 ; *Welch* v. *Sage*, 47 N. Y. 143 ; *Magee* v. *Badger*, 34 N. Y. 247 ; *Belmont Br. Bank* v. *Hoge*, 35 N. Y. 65 ; *Goodman* v. *Simonds*, 20 How. 343 ; *Bank of Pittsburgh* v. *McNeal*, 22 How. 96 ; *Murray* v. *Lardner*, 2 Wall. 110 ; *Parker* v. *Conner*, 93 N. Y. 118 ; *Bush* v. *Roberts*, 111 N. Y. 278 ; *Wilde* v. *Gibson*, 1 H. L. Cas. 605.) The measure of damages adopted by the referee was proper. (*Kortright* v. *Com. Bank*, 20 Wend. 91 ; 22 Wend. 367 ; *Allen* v. *S. B. R. R. Co.*, 150 Mass. 200 ; *Parmenter* v. *Fitzpatrick*, 135 N. Y. 190 ; *In re Johnston*, 144 N. Y. 563 ; *Crounse* v. *Fitch*, 1 Abb. Ct. App. Dec. 475 ; *Hoffman* v. *Conner*, 76 N. Y. 121.)

ANDREWS, Ch. J.    The rigid rule of the common law which prohibited the assignment of choses in action was, in England, at an early day, relaxed to some extent to conform to the usages of merchants and the necessities of commerce, and at length, by the aid of statutes and judicial decisions, bills of exchange and promissory notes were completely taken out of its influence, and they came to have distinct attributes and qualities not pertaining to any other form of contract. They were not only made transferable by delivery and suable in the name of the transferee, but, contrary to the general rule of the common law, "honest acquisition" for value was held to give to the transferee a new and original title, wholly independent of that of the prior holder and subject to no infirmity which affected the paper in his hands.    The real owner, who had been despoiled of the paper by robbery or theft, or who had lost it without negligence, was concluded from re-claiming it, and the

maker, although he had been defrauded into executing it, could not be heard to allege the fraud as a defense against a *bona fide* holder. And the transferee, although he may have been negligent in taking it, and omitted precautions which a prudent man would have taken, nevertheless, unless he acted *mala fide*, his title, according to the doctrine now settled, will prevail. These familiar but arbitrary principles applicable to commercial paper, originating in commercial policy, the encouragement of trade, the convenience of having some representative of money readily convertible and commanding confidence, while they operate in many cases with great severity upon the rights of innocent persons, have contributed greatly to stimulate commerce and advance the prosperity of states. The principles applicable to negotiable paper have been extended to embrace public debentures payable to bearer, and bonds of corporations, and some of the incidents of negotiability have either by custom or statute been applied to instruments not strictly negotiable. Certificates of stock, in business corporations, are embraced in the class last mentioned. They are not negotiable in form, they represent no debt and are not securities for money. But the courts of this country, in view of the extensive dealings in certificates of shares in corporate enterprises, and the interest both of the public and of the corporation which issues them, in making them readily transferable and convertible, have given to them some of the elements of negotiability. The owner of shares may transfer his title by delivery of the certificate with a blank power of attorney indorsed thereon signed by the owner of the shares named in the certificate. Such a delivery transfers the legal title to the shares as between the parties to the transfer, and not a mere equitable right. (*McNeil* v. *Tenth National Bank*, 46 N. Y. 325.) The transferee in good faith and for value, holds his title free from latent equities between prior parties in the line of transmission. Under the doctrine of implied agency and the application of the principle of estoppel to the situation, the true owner is in many cases precluded from asserting his title. The case of

*McNeil* v. *Tenth National Bank* is a leading case on the subject, and marks the limit to which the court has hitherto gone in subordinating the rights of the true owner of a stock certificate to the title of a transferee derived under one who, being in possession of the certificate by the consent of the true owner, has transferred it in fraud of his rights. That case holds that an agent to whom the owner has delivered a certificate of stock duly indorsed for transfer, with a limited power of disposition for a special purpose, may bind the title thereto as against the true owner by transferring it to a *bona fide* transferee who has no notice of the limitations of the agent's authority, although the transfer was made for an unauthorized purpose and with the intention on the part of the agent to commit a fraud upon his principal. The certificates there in question were pledged by the owner with brokers to secure advances, having indorsed thereon in form an unconditional power of attorney to make all necessary transfers, but with a limited authority to use the power only when necessary to make the pledge available. The brokers, in violation of their duty, pledged the shares for a large sum for their own purposes, and the controversy was between the original owner and the pledgees of the brokers. It was decided that, under the circumstances disclosed, the original owner, having placed the certificates in the hands of the brokers with power of disposition, was estopped as against the pledgees in good faith and for value, from denying their authority to transfer, upon the principle that the owner should rather suffer for his misplaced confidence in the brokers than those who dealt with them on the strength of an apparent authority. In the well-known case of *New York and New Haven Railroad Company* v. *Schuyler* (34 N. Y. 30) the same principle of implied agency was applied to charge the corporation with liability in damages for spurious stock issued by Schuyler, the president and transfer agent of the company.

The courts have been frequently importuned to extend the qualities of negotiability of stock certificates beyond the

limits mentioned, and clothe them with the same character of complete negotiability as attaches to commercial paper, so as to make a transfer to a purchaser in good faith, for value, equivalent to actual title, although there was no agency in the transferrer, and the certificate had been lost without the fault of the true owner or had been obtained by theft or robbery. But the courts have refused to accede to this view, and we have found no case entitled to be regarded as authority which denies to the owner of a stock certificate which has been lost without his negligence, or stolen, the right to reclaim it from the hands of any person in whose possession it subsequently comes, although the holder may have taken it in good faith and for value. The precise question has not often been presented to the courts, for the reason probably that they have with great uniformity held that stock certificates were not negotiable instruments in the broad meaning of that phrase, but, whenever the question has arisen, it has been held that the title of the true owner of a lost or stolen certificate may be asserted against any one subsequently obtaining its possession, although the holder may be a *bona fide* purchaser. (*Anderson* v. *Nicholas*, 28 N. Y. 600; *Bangor Electric Light & Power Co.* v. *Robinson*, 52 Fed. Rep. 520; *Biddle* v. *Bayard*, 14 Pa. St. 150; *Barstow* v. *Savage Mining Co.*, 64 Cal. 388.  See *Shaw* v. *R. R. Co.*, 101 U. S. 557.)  It may be observed that the elaborate opinion of Judge RAPALLO in *McNeil* v. *Tenth National Bank*, to show that the plaintiff in that case was estopped from asserting his title on the ground of implied agency, was quite unnecessary if a transfer of a stock certificate indorsed in blank to a *bona fide* holder conferred a title as against the true owner, irrespective of the fact whether he voluntarily parted with the possession or was deprived of it by felony or fraud.  It is plain, we think, that the argument in support of the judgment in this case, based on the complete negotiability of stock certificates, is not supported by, but is contrary to the decisions.  If public policy requires that a further advance should be made in more completely assimilating them to commercial paper in the qualities of negotiability, the legislature

and not the courts should so declare. Under the law as it has hitherto prevailed there does not seem to have been any serious hindrance in dealing with property of this character. It may, perhaps, be doubted, taking into consideration the interests of investors as well as dealers, whether it would be wise to remove the protection which the true owner of a stock certificate now has against accident, theft or robbery. The system of registry of negotiable bonds, which prevails to a considerable extent, authorized by statutes of some of the states, and of the United States, seems to indicate a tendency to restrict rather than to extend the range of negotiable instruments.

Nor, in our opinion, can the judgment below be sustained upon any principle of agency in Jurgens, express or implied, to issue the surrendered certificates, which, on the issue of the new certificates to Siebrecht, became mere vouchers in possession of the company. If it can be said that the direction of the president to Jurgens to cancel the certificates made him the agent of the company for that purpose, it was an authority to destroy and not to use. His act in abstracting them from the safe and uttering them as valid certificates had no relation to the authority conferred. It was not an act of the same kind as that which he was authorized to perform. He had no apparent authority to issue them as genuine certificates, because he had no authority to issue certificates for any purpose, and what he did was, as was said in *Manhattan Life Ins. Co.* v. *42nd St. & G. S. F. R. R. Co.* (139 N. Y. 146), "a willful and criminal act perpetrated for private gain and not connected with any official authority or semblance of authority which he possessed as the defendant's agent." The certificates were, at all times after their surrender and before they were abstracted by Jurgens from the safe of the defendant, in the legal possession of the company. The company never placed them in the possession of Jurgens or invested him with the *indicia* of ownership. He had access to the safe as the mere servant of the defendant. The doctrine of implied agency is,

58

we think, wholly inapplicable to the circumstances of this case.

We come, therefore, to consider the ground upon which the learned referee placed his judgment against the defendant, viz.: the negligence of the company. The claim of liability of the defendant on the ground of negligence is based on the fact that in violation of its by-laws it permitted the surrendered certificates to remain uncanceled in its safe, to which Jurgens had access, and thereby enabled him to commit the fraud, and upon the further allegation that the company neglected to exercise a proper supervision over its business and the conduct of its employees, and committed to Jurgens the management of its affairs without special inquiry into the manner in which he discharged his duties. We are of opinion that the company was not chargeable with any negligence which gives a right of action for the injury caused to the plaintiff by the fraudulent use by Jurgens of the surrendered certificates. The surrendered certificates were placed by the company in its safe in its office, of which Jurgens had the key, and thereby, it may be said, afforded him the opportunity to commit the crime of which he was guilty, in abstracting and uttering them as valid. But it is not true as a general rule that a man may not intrust his property to the custody of his servant, except at the peril of losing his title thereto if the servant steals and disposes of it to another. There must be something more than the mere intrusting to a servant of the custody of a chattel and the consequent opportunity for theft, in order to preclude the master from reclaiming it, if stolen by the servant and sold to another. (Rapallo, J., in *McNeil* v. *Tenth National Bank, supra,* p. 329.) The rule declared by Ashurst, J., in *Lickbarrow* v. *Mason* (2 D. & E. 70), frequently quoted, that "Whenever one of two innocent persons must suffer by the act of a third, he who has enabled the former to occasion the loss must sustain it," has no application to such a case. The case in which the rule was stated affords a good illustration of its application. The consignor and vendor of the goods had by the delivery of a bill of lading

delivered the possession of the goods to the holder with power according to the law merchant to transfer them by indorsement of the bill, and it was held that as against a transferee in good faith for value, the right of stoppage in transitu was lost.   It was a case where the vendor had by his affirmative act enabled the holder to commit a fraud upon his rights and it was justly held that he should bear the loss rather than the innocent purchaser.   The familiar statement of Lord HOLT, in *Hern* v. *Nichols* (1 Salk. 289), " for seeing somebody must be a loser by this deceit, it is more reason that he that employs and puts a trust and confidence in the deceiver should be a loser, than a stranger," was made in a case where the question was whether a merchant was liable for the deceit of his factor in the sale of goods represented to be of one quality when they were of another.   The principle announced by Lord HOLT has been frequently applied to such and similar cases. But the employment of a servant to whom is intrusted the master's property, with no power of disposition, is not alone such a putting of trust and confidence in the servant by the master as to enable the latter by his wrongful act to defeat the master's title.   The rule which would convert the mere employment of a servant into an authority in him, as to third persons, to sell or dispose of his master's goods intrusted to him for safe keeping, would be highly dangerous, and has no sanction in the adjudged cases.

It remains to consider whether there were any special circumstances in this case which take it out of the general rule adverted to.   Jurgens had been in the employment of the defendant for several years prior to the transaction in question and nothing had come to the knowledge of the defendant which raised doubt as to his honesty and faithfulness.   The facts found by the referee show that the defendant reposed confidence in his integrity, and, so far as appears, the abstraction and uttering of the surrendered certificates was his first act of malversation during his employment.   His power in respect to the issuing of certificates on the transfer of stock was clerical only.   In case of transfer, he was accustomed to cancel the sur-

rendered certificates and paste them in the certificate book, pre-
pare the new certificate and impress the company's seal thereon,
and then procure the president of the company to sign it.    In
every case prior to the one in question, the president signed
the new certificate only, when the surrendered certificate was
presented to him by Jurgens, canceled, together with the
new certificate. There was a departure from that prac-
tice in the single instance in question under the special cir-
cumstances found by the referee.   The president of the com-
pany knew when he signed the new certificate that the old cer-
tificates had been surrendered and were then in possession of
the company, because he had himself placed them in the safe,
and the fraud of Jurgens was made possible because the presi-
dent relied upon Jurgens to cancel the surrendered certificates
as he had directed him.   It is urged that the improper use
made of the certificates might reasonably have been expected
to result from leaving them in the safe of the company in his
care uncanceled.   In other words, the claim is that the com-
pany ought to have anticipated that Jurgens might commit
the crimes of forgery and larceny, and put the certificates on
the market if they were left uncanceled under his control.
We do not assent to this suggestion.   If the company knew
that Jurgens was dishonest, or had reason to suspect his hon-
esty, a different question would be presented.   But it is not
generally an omission of ordinary prudence that an employer
deals with his employees on the assumption that those who
have hitherto been faithful in the performance of their duties
will continue so to be, or because he does not anticipate and
provide against the possibility of their criminal acts.   Breaches
of trust and confidence unfortunately are not infrequent.   But
honesty is nevertheless, we believe, the general rule of human
conduct, and one may indulge in this faith in human nature
and trust those who have proved themselves worthy of it
without subjecting himself to a charge of negligence if it
should turn out that they afterwards yielded to temptation
and used their position to the injury of others.   "It is one
thing to say that a man shall be amenable for such immediate

consequences of his acts as a reasonable man might foresee and dread and, therefore, shun.   But it is another and very different proposition to maintain that a man shall forfeit his property because he has done an act which will not be perilous unless others are guilty of misconduct which that act does not cause." (WILLIAMS, J., *Ex parte Swan*, 7 C. B. [N. S.] 447. See, also, BRAMWELL, L. J., *Baxendale* v. *Bennett*, L. R. [3 Q. B. D.] 530.)

The fact that in the particular instance the defendant did not observe the by-law, and issued the new certificate without the actual cancellation of the surrendered certificates, was not, we think, as to the plaintiff, actionable negligence.   It may be admitted that a business corporation is bound to exercise reasonable care in respect to the transfer of its shares.   The defendant had adopted the usual precautions, and its by-laws required that transfers should be made only on the surrender and cancellation of outstanding certificates.   The certificates on their face carried an assurance by the company that the shares represented had not been transferred on the books of the company, while the original certificates were outstanding.   There was no representation on the face of the certificates that surrendered shares would be actually canceled by the company.   The company, however, had by the by-law provided that this should be done, and it is said, and it is undoubtedly true, that this regulation was in conformity to the usual practice of stock corporations.   By-laws are primarily for the protection of the corporation enacting them and its stockholders.   The regulation that transfers shall only be made on the books on surrender of the outstanding certificates is essential as well for the protection of the company as the dealers in the stock.   The regulation for actual cancellation of surrendered certificates is a still farther protection. But can it be justly said that this latter regulation was so obligatory on the company that a single departure therefrom under special and peculiar circumstances, which gave an opportunity for Jurgens' crime, was, as to the plaintiff, actionable negligence?   We think it was not.   To constitute action-

able negligence there must not only be a violation of duty owing by one to another or to the public, but the injury must be the natural consequence of the alleged negligent act or one which might reasonably have been anticipated. PARKE, B., in the *Bank of Ireland* v. *Trustees of Evans' Charities* (5 H. L. Cas. 389), where it was claimed a corporation was bound by the fraudulent affixing by its secretary of the seal of the corporation in his custody, to a power of attorney to transfer its funds in the Bank of Ireland, states the true ground of actionable negligence in such a case. Speaking for the judges he says : " They are all of opinion that the negligence which would deprive the corporation of their right to insist that the transfer was invalid, must be negligence in or immediately connected with the transfer itself." BLACKBURN, J., in *Swan* v. *N. B. Australasian Co.* (2 H. & C. 181), states the principle with even greater perspicuity. He says : " The neglect must be in the transaction itself, and be the proximate cause of leading the party into the mistake ; and also, as I think, that it must be the neglect of some duty that is owing to the person led into that belief, or, what comes to the same thing, to the general public, of whom the person is one, and not merely neglect of what would be prudent in respect to the party himself, or even of some duty owing to third persons, with whom those seeking to set up the estoppel are not privy."

The claim that the injury to the plaintiff was occasioned by the omission of the defendant to exercise proper supervision over the conduct of Jurgens has, we think, no force. There was an interval of about three weeks between the time when the certificates were surrendered to the company and their abstraction and transfer by Jurgens. If during this period the officers of the defendant had examined the contents of the safe, it might have been ascertained that the certificates were uncanceled. An examination after that time would not have benefited the plaintiff, at least there is no evidence that a discovery of the fraud after it had been accomplished would have changed his position. The transfers of stock on the books of the company were comparatively infrequent. The presi-

dent had reason to suppose that Jurgens would obey his directions and cancel the certificates, and the omission to inquire whether he had done so, during the period mentioned, is, as we think, quite insufficient to support the charge of negligence.

Finally, if the company had been the owner of some of its own shares, or if it had owned shares in other corporations which had been deposited in its safe for safe keeping, and they had been stolen and sold by Jurgens to the plaintiff, there can be no doubt that the company could reclaim them, and the loss would fall upon him. It is difficult to see how he could acquire a better right to the surrendered certificates or charge the company with damages resulting from Jurgens' crime.

Having reached the conclusion that there was no actionable negligence on the part of the defendant, it is unnecessary to consider the other questions argued at the bar.

The judgment below should be reversed and a new trial ordered, with costs in all the courts to abide the event.

All concur.

Judgment reversed.